## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MARSHA K. DUGAS, Individually and
as Personal Representative of the
Estate of Darryl S. Dugas,

        Plaintiff,

v.                                Case No. 3:14-cv-1096-J-39JBT

3M COMPANY, et al.,

        Defendants.

_____/

### ORDER

**THIS CAUSE** is before the Court on Defendant 3M Company's Motion for

Exclusion of Testimony of Darell Bevis (Doc. 350) and Motion for Summary Judgment

(Doc. 354) (collectively, the "Motions"). Plaintiff filed her Responses in Opposition

(Docs. 407 and 408) and the Court held a hearing on the Motions on February 2, 2016

("Hearing"). Accordingly, the matters are ripe for review.

### I.    BACKGROUND

Plaintiff's Third Amended Complaint alleges claims of negligence, strict liability,

fraudulent concealment, and loss of consortium. See generally (Doc. 564). Darryl Dugas

and Plaintiff Marsha Dugas initiated suit seeking to recover damages related to Mr.

Dugas's development of malignant mesothelioma. Unfortunately, Mr. Dugas passed

away after filing suit. (Doc. 522). Ms. Dugas now maintains this suit individually and as a representative of the Estate of Darryl Dugas.[1]

Ms. Dugas alleges that Mr. Dugas developed mesothelioma from his exposure to asbestos during the late 1960's and early 1970's while serving in the United States Navy. Ms. Dugas attributes Mr. Dugas's asbestos exposure to several products allegedly manufactured and distributed by Defendants. Ms. Dugas also claims that Defendant 3M Company's ("3M") 8500 non-toxic particle mask was defective by virtue of its design and on account of its inadequate warnings. 3M now seeks summary judgment, arguing that: 1) Plaintiff cannot establish that Mr. Dugas used a 8500 mask during the relevant time period of his alleged exposure; 2) Plaintiff cannot show that the 8500 mask was defective; 3) 3M had no duty to warn of the mask's limited efficiency when used around asbestos; 4) in the alternative, 3M met its duty to warn by providing a sufficient warning regarding the use of the 8500 mask; and 5) Plaintiff's fraudulent concealment claim is barred by the statute of repose and is not supported by any evidence. 3M also argues that Ms. Dugas cannot establish causation in her failure to warn claim. To begin consideration of 3M's position, the Court first recites the evidence in the light most favorable to Plaintiff. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

Mr. Dugas began his service in the United States Navy on January 10, 1967. (Doc. 615.1 at 10). Following his successful completion of basic training, Mr. Dugas was assigned to be an aviation structural mechanic or metal-smith ("AMS"). Id. His job duties

---

[1] Pending before this Court is Defendants' Motion to Dismiss (Doc. 568), which takes issue with the Third Amended Complaint on various grounds. The Court does not address that motion here.

were general aircraft maintenance, which included documenting and repairing defects. Id. at 20-21. The Navy first sent Mr. Dugas to the Keflavik Air Base in Iceland, where he was stationed until sometime in 1968. (Doc. 615.4 at 2). While stationed in Keflavik, Mr. Dugas removed cement panels from "old World War II barracks" to allow for their remodeling. (Doc. 615.1 at 22). The removal of the cement panels required the use of hammers and saws, which created a lot of dust that circulated through the air, though Mr. Dugas did not know what was in the cement panels. Id. While tearing out the panels, Mr. Dugas used a "little white paper thing[] that you put on and pinch your nose . . . [that] had an elastic band around it that [he] would always hook [o]n [his] ears []." Mr. Dugas could not recall the brand or name of the mask he used, but he did not think that the mask protected him from dust exposure. Id. at 23.

Following his stay in Keflavik, the Navy sent Mr. Dugas to Cecil Field in Jacksonville, Florida. (Doc. 615.1 at 29). During his time at Cecil Field, Mr. Dugas inspected, maintained, and repaired the exterior of A-7 aircraft. Id. The repair of the A-7 aircraft sometimes involved the use of the epoxy adhesive known as "934." Id. at 31. Use of the adhesive involved multiple steps including mixing, applying, and drying. Id. at 31-32. The epoxy would harden as it dried. Id. Mr. Dugas would file the epoxy to keep the surface smooth and consistent, which created a "dusty [environment]—something that you didn't want to be breathing in." Id. at 32-33. Even with his wearing of "little white masks," Mr. Dugas did not "feel too safe" when working with the epoxy. Id. The 934 epoxy adhesive Mr. Dugas used contained chrysotile asbestos. (Doc. 408.7 at 5). The 934 epoxy did not come with a warning that it contained asbestos, rather it "cautioned

the user to use the product in areas with good ventilation, to use rubber gloves and eye protection, and to wear appropriate clothing." Id. at 8.

Mr. Dugas was deployed on the USS Roosevelt during the last part of 1968 or the early part of 1969 for approximately one year before returning to Cecil Field and eventually receiving an honorable discharge in January of 1971. (Doc. 615.1 at 34). While Mr. Dugas toured on the USS Roosevelt, he inspected entire aircraft, recorded his findings, and repaired anything that needed to be fixed before he placed the aircraft back in service. (Doc. 615.1 at 21). This included cleaning engine bays of the aircraft. Id. at 37. Mr. Dugas did not have a respirator, but only "paper dust masks," which he made every effort to wear when working with the aircraft. (Doc. 615.5 at 14); see also (Doc. 615.5 at 22 (Mr. Dugas describing a "dust mask" as whatever the Navy gave him with a "[t]hin metal strap over the nose, rubber band, and that was it.")).Mr. Dugas also assisted engine mechanics in removing and reinstalling engines in the aircraft. (Doc. 615.1 at 36). Once the engines were removed, Mr. Dugas would inspect the engine bays and, at times, clean the engine bays by hand or with compressed air, which created airborne residue. Id. at 38. Additionally, Mr. Dugas was close enough to engine mechanics to hear their use of compressed air to clean the engines. Id. at 39. The A-7 aircraft with which Mr. Dugas worked each contained TF30 engines. Id. The TF30 engines supplied to the Navy during Mr. Dugas's tenure contained various asbestos containing components. (Doc. 408.28 at 7-8). The engines did not come with a warning regarding the existence of asbestos in the engine. (Doc. 408 at 24-26).

## II.   PROPOSED EXPERT TESTIMONY OF DARELL BEVIS

3M seeks to exclude the proffered expert testimony of Darell Bevis who opines that 3M's 8500 dust mask was defectively designed. 3M's position is grounded in a myriad of reasons. First, 3M contends that Mr. Bevis is unqualified to render opinions on alleged defects in respiratory protection equipment. (Doc. 350 at 3). Second, 3M argues that Mr. Bevis's opinion is not based on a reliable methodology or factual basis. (Id. at 4). Third, Mr. Bevis's conclusion is irrelevant and unfairly prejudicial, and lastly, that Mr. Bevis is "nothing more than a paid advocate." (Id. at 2). 3M also argues that Mr. Bevis's opinion that Mr. Dugas wore an 8500 dust mask while in the Navy lacks a factual basis, and that Mr. Bevis is not sufficiently qualified to offer that opinion.

### 1.   Standard of Review

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.[2] In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), the

Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as

gatekeeper, to ensure that any and all scientific testimony or evidence admitted is not

only relevant, but reliable. Daubert, 509 U.S. at 589.[3] In evaluating the admissibility of

expert testimony, a trial court must consider if:

> (1) the expert is qualified to testify competently
> regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by
> the sort of inquiry mandated in Daubert; and
> (3) the testimony assists the trier of fact, through the
> application of scientific, technical, or specialized
> expertise, to understand the evidence or to
> determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of

Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)); see also

Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir.

2003). "The burden of laying the proper foundation for the admission of the expert

testimony is on the party offering the expert, and admissibility must be shown by a

preponderance of the evidence." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe

Cnty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005) (internal quotation and citations

omitted). "Determining whether a witness is qualified to testify as an expert requires the

---

[2] The language of Rule 702 was revised in 2011 for stylistic reasons only, with "no intent to change any result in any ruling on evidence admissibility." Fed. R. Evid. 702 advisory committee's notes 2011 Amendments. Thus, case law construing former Rule 702 remains viable and is applicable here.

[3] Although the expert testimony at issue in Daubert was scientific, the Supreme Court held in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), that the Daubert analysis and a trial judge's role as gatekeeper "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire, 526 U.S. at 141.

trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation and citation omitted). With these standards in mind, the Court examines the testimony offered by Mr. Bevis.

      2.   *Discussion*

      a.   Product Identification

"When an expert witness relies mainly on experience to show he is qualified to testify, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliable [sic] applied to the facts." Payne v. C.R. Bard, Inc., 606 F. App'x 940, 942-43 (11th Cir. 2015) (citation and internal quotations omitted). 3M cites Mr. Bevis's lack of higher education (Doc. 350.1 at 4-5. (Mr. Bevis's education ended with a high school diploma)); and his lack of certification as an industrial hygienist to demonstrate that Mr. Bevis is unqualified to offer opinions on the proper design and identification of respiratory protection. Id. at 5.[4] 3M also heavily relies on the case of Bryant v. 3M Co., 78 F. Supp. 3d 626 (S.D. Miss. 2015), which excluded Mr. Bevis's opinions regarding the design and manufacturing of masks, many of which are the same opinions before this Court. Bryant, 78 F. Supp. 3d at 629. Plaintiff counters with citations to Mr. Bevis's experience in the field of industrial hygiene for over 54 years. (Doc. 407.5 at 2) and his apprenticeship under Edwin Hyatt, a nationally known certified industrial hygienist.

---

[4] While Mr. Bevis is not a certified industrial hygienist, he has been a member of the American Industrial Hygiene Association (AIHA) for approximately thirty-five years, with a five year lapse in membership. (Doc. 350.1 at 5). To become a member of AIHA, one must have a college degree or equivalent training and experience. Id.

(Doc.407.7 at 10). Further, Plaintiff highlights that the court in Bryant acknowledged Mr. Bevis as an expert in the proper use of respirators, including fit testing and user seal checks. Bryant, 78 F. Supp. 3d at 631.

Mr. Bevis has 54 years of experience working in the field of respiratory protection. While the nature and complexity of his work is in dispute, his experience certainly exposed him to a variety of dust masks, including the 3M 8500. (Doc. 407.5 at 3; Bevis Report ("In 1972, I became a Respirator Training Specialist at University of California, Los Alamos National Laboratory . . . [which involved] practical use of all types of respiratory protection devices . . . ."). In fact, Mr. Bevis "first encountered the 3M 8500 . . . in the early 1960s." Id. at 6. In conjunction with his mentor Ed Hyatt, Mr. Bevis tested the 3M 8500 with the Q127 test, which involved "light scattering photometry" to measure aerosol penetration of the 8500 dust mask. The results from the test were published as Comparison of Respirator Filter Penetration by Dioctyl Phthalate with Ed Wyatt in the American Industrial Hygiene Association Journal. (Doc. 407.7 at 10). From his personal experience working with and around the 8500 dust mask, as well as other forms of respiratory protection, Mr. Bevis is qualified to offer an opinion regarding product identification.

3M also argues that Mr. Bevis's opinion that Mr. Dugas wore a 3M 8500 dust mask is devoid of a factual basis. The record belies 3M's position. 3M's own designated expert Robert Weber testified that 3M introduced the 8500 dust mask to the market around 1962. (Doc. 408.10 at 6). This testimony is consistent with Mr. Bevis's testimony that the 8500 came into the market "in like '62 or '64." (Doc. 625.1 at 27). 3M continued selling the mask through 2003, after which time it was discontinued. (Doc. 408.10 at 6).

Mr. Weber describes the 8500 mask as having three distinctive features: a white, ribbed cup-shaped filter; a metal strip located where the bridge of a wearer's nose would sit; and an elastic strap. Id. at 8. This design was unique through 1971. Id.

Mr. Dugas described the masks he wore while working with various asbestos containing products as a "dust mask" with a "[t]hin metal strap over the nose, rubber band, and that was it." (Doc. 408.3 at 5). Thus, Mr. Dugas's description of the mask he wore was consistent the description of the 8500 dust mask given by 3M's own designated expert Robert Weber. Mr. Weber's testimony that 3M's design through 1971 was unique increases the probability that the mask Mr. Dugas used was a 3M 8500 dust mask since the relevant time period in this case is 1967-1971.[5] Accordingly, Mr. Bevis's opinion is not only supported by the facts of the case, but it is consistent with the testimony of 3M's own expert witness Robert Weber. As to testimony offered by other eye witnesses regarding the description of the respiratory protection Mr. Dugas wore, it is best considered while weighing Mr. Bevis's testimony. See Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (internal citation and quotations omitted).

b.     Design Defect

Mr. Bevis opines that the 8500 dust mask was defectively designed because it could not protect against asbestos exposure due to its inability to seal around the user's

_____

[5] Mr. Bevis also testified that masks simulating the look of the 8500 dust mask were hard to find through the early 1970's. (Doc. 625.1 at 54).

face and because of its poor filter media. As to his opinion regarding the media filter, Mr. Bevis's conclusion appears to be supported only by the Q127 study mentioned above and other unpublished and unavailable studies from the 1960s. (Doc. 350.1 at 18). Yet, Mr. Bevis fails to explain how the Q127 study, which involved the penetration of non-asbestos particles, applies to the 8500's ability to filter asbestos particles. Moreover, Mr. Bevis's inability to identify the composition of the 8500's media filter, and how that material may or may not be effective at filtering asbestos particles further undermine his opinion. Accordingly, Mr. Bevis's opinion does not appear to be based on a reliable methodology, or if it is, he has failed to show he reliably applied that methodology to reach his conclusion that the 8500 dust mask is defectively designed and that its media filter is inadequate to protect against asbestos.

Mr. Bevis's opinion on the fit of the 8500 dust mask stands on sturdier grounds. He has previously been deemed an expert regarding the proper fit, selection, and use of respiratory protection. Bryant, 78 F. Supp. 3d at 631. He has taught, trained, selected, and managed various programs regarding the proper selection, fitting, and use of respiratory protection. E.g., (Doc. 407.5 at 2). However, Mr. Bevis's opinion regarding how the fit and seal of the 8500 mask rendered the 8500 mask defective is lacking. It is one thing for Mr. Bevis to opine that the fit of the mask would not protect the user from dust hazards, and it is quite another to opine that this lack of protection is a design defect.[6] Mr. Bevis fails to establish what methodology was employed and how that

---

[6] Consistent with Bryant, the Court finds that Mr. Bevis is qualified to offer an opinion on the fit of different forms of respiratory protection. Bryant, 78 F.Supp.3d at 632. However, Mr. Bevis fails to explain how the fit of the 8500 dust mask would fail to protect the wearer from asbestos. Similar to the flaw in his opinion regarding the filter efficiency

methodology was applied to reach his opinion that the 8500 mask was defective for failing to protect against hazardous dusts, such as asbestos.[7]

Additionally, Plaintiff failed to show how Mr. Dugas's experience with respiratory protection translated to expertise on the subject of respiratory protection design. Mr. Bevis does not own any patents for respirator design; he has not published any papers about the design of respirators; he has never manufactured a respirator; and his opinions have never been subject to peer review. (Doc. 625.1 at 14). The only experience Mr. Bevis cites which support his designation as an expert in respiratory protection design is his testing of various forms of respiratory protection and making recommendations to the manufacturers. Id. Yet, Plaintiff fails to orient the Court to documentation on Mr. Bevis's work in this area to allow for a meaningful analysis. Instead, Mr. Bevis categorizes his work as "bootleg studies" which may or may not be contained in "lab notebooks [that] probably don't even exist." Id. at 16-17. It was Plaintiff's burden to demonstrate how Mr. Bevis's prior experience would qualify him as an expert on respiratory protection design, and the Court will not speculate as to what Mr. Bevis may have done in secret, unpublished, or destroyed studies. Accordingly, Plaintiff has failed to establish that Mr. Bevis is qualified to offer an opinion on a purported design defect of the 8500 dust mask.

---

of the 8500 dust mask, he fails to explain how the results from the Q127 study regarding the fit of the mask are applicable to asbestos.

[7] The Court also notes that Mr. Bevis's opinion that 3M advertised the 8500 respirators to consumers without indicating that it was for use with non-toxic dusts is not supported by a sufficient factual basis. See (Docs. 354.11 and 354.12).

c.    Bias

3M fails to offer any authority that Mr. Bevis's testimony must be excluded because of his alleged bias in favor of plaintiffs. Such complaints go to the weight of his testimony, not its admissibility. See e.g., Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1334-35 (11th Cir. 2014) (In overruling the district court's exclusion of an expert, the Eleventh Circuit explained that "[a]ll of the bias concerns that the court raised could have been presented to and considered by the jury. LabCorp could cross-examine Dr. Rosenthal to bring out any bias she had and to expose the risk of bias inherent in the methodology she used."); see also Furmanite Am., Inc. v. T.D. Williamson, Inc., 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007) ("A district court may not exclude an expert because it believes the expert lacks personal credibility.") (internal citation and quotations omitted); but see Hall v. C.I.A., 538 F. Supp. 2d 64, 73 (D.D.C. 2008) (the court found that a proposed expert that was also a plaintiff was an advocate with a partisan axe to grind as one of several reasons for his exclusion). In this case unlike in Hall, Mr. Bevis is not attempting to serve as both a plaintiff and expert, and therefore, 3M's attacks must be addressed to Mr. Bevis's credibility.

## III.   MOTION FOR SUMMARY JUDGMENT

### 1.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the Court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir.

1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

      2.     *Discussion*

      a.     Use of the 3M 8500 Mask

3M argues that without the expert testimony of Darell Bevis, Plaintiff cannot establish that Mr. Dugas used the 8500 dust mask. (Doc. 350 at 1). In support, 3M cites to Mr. Dugas's testimony in which he could not recall the name of the manufacturer of the mask he wore and his testimony that there were no "other distinguishing characteristics" of the masks he used while in the Navy. (Doc. 350.4 at 31). 3M's argument continues that an inability to establish that Mr. Dugas used the 8500 dust mask prevents Plaintiff from maintaining her suit against 3M.

Upon review of the evidence, the Court did not need to decide on the admissibility of Mr. Bevis's testimony before determining that there is sufficient evidence that Mr. Dugas used the 3M 8500 dust mask.[8] 3M's designated expert Robert Weber testified that 3M introduced the 8500 dust mask to the market around 1962. (Doc. 408.10 at 6). 3M continued selling the mask through 2003, after which time it was discontinued. <u>Id.</u> Mr. Weber describes the 8500 mask as having three distinctive features: a white, ribbed cup-shaped filter; a metal strip located where the bridge of wearer's nose would sit; and an elastic strap. <u>Id.</u> at 8. This design was unique through 1971. <u>Id.</u> Mr. Dugas described the masks he wore while working with various asbestos containing products as a "dust mask" with a "[t]hin metal strap over the nose, rubber

---

[8] The Court determined that Mr. Bevis's opinion on product identification is admissible. <u>See supra</u> Section (II)(2)(a) "Product Identification."

band, and that was it." (Doc. 615.5 at 22). Mr. Dugas's description of the mask he wore was consistent with 3M's own expert's description of the 8500 dust mask. Mr. Weber's testimony that 3M's design through 1971 was unique increases the probability that the mask Mr. Dugas used was a 3M 8500 dust mask since the relevant time period in this case is 1967-1971. Thus, even without Mr. Bevis's testimony, there is enough consistency between Mr. Weber's expert testimony describing the 8500 mask and Mr. Dugas's description of the masks he wore in the Navy that a reasonable jury could find that Mr. Dugas used the 3M 8500 dust mask between 1967 and 1971.

b.     Fraudulent Concealment

In her Third Amended Complaint, Plaintiff levies a claim of fraudulent concealment against 3M for 3M's alleged intentional withholding of information that was exclusively in its possession regarding the efficacy of its 8500 dust mask. Specifically, Plaintiff claims that 3M sold its 8500 dust masks to the Navy "for use with asbestos and asbestos-containing products." (Doc. 564 ¶ 114). Plaintiff goes on to claim that at the time 3M sold the masks to the Navy, 3M knew the masks could not protect its users against asbestos, but failed to disclose that information to the Navy. Id. at ¶ 115. 3M contends that section 95.031(2)(a), Florida Statutes, bars Plaintiff's claim for fraudulent concealment. Plaintiff did not respond to 3M's argument.

Section 95.031(2)(a) requires that "an action for fraud . . . beg[in] within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered." The operative date for the commencement of the statute of repose "run[s] from the date of a discrete act on the part of the defendant[.]"

Philip Morris USA, Inc. v. Russo, 175 So. 3d 681, 686 (Fla. 2015), reh'g denied (Sept. 25, 2015) (internal citation and quotations omitted).

This case was filed on August 14, 2014. (Doc. 1.1; State Court Docket). Thus, 3M must have fraudulently concealed the fact that the 8500 dust mask did not protect against asbestos after August 13, 2002. Taking the evidence in the light most favorable to Plaintiff, 3M's last act of fraudulent concealment regarding the 8500 dust mask and its inefficacy against asbestos occurred in 1978. (Doc. 408.10 at 26 (testimony that 3M began including warnings that the 8500 dust mask was not designed to protect against asbestos in the late 1970s)); (Doc. 408.25; September 26, 1978 3M Interoffice Memorandum (discussing new warning to accompany all 8500 dust masks to include a warning that the mask is not designed for use as protection against asbestos)). In fact, Plaintiff claims that by the 1990s the warnings were affixed directly to the mask and included a warning that the mask would not protect the wearer's lungs. (Doc. 408.26). Accordingly, the evidence before the Court demonstrates that 3M's most recent act of concealment occurred prior to August 14, 2002, and, therefore, Plaintiff cannot recover on a theory of fraudulent concealment.

c.      Negligence and Strict Liability

Plaintiff's claims of negligence and strict liability both require "that (1) a defect existed in the product, [and] (2) the defect caused the injury . . . ." See Cooper v. Old Williamsburg Candle Corp., 653 F. Supp. 2d 1220, 1223 (M.D. Fla. 2009) (citations omitted); Wolicki-Gables v. Arrow Int'l, Inc., 641 F. Supp. 2d 1270, 1287 (M.D. Fla. 2009) aff'd, 634 F.3d 1296 (11th Cir. 2011) ("Proof of negligent design . . . requires evidence of the existence of a defect in the product" and that the defendant's "alleged

negligence was the proximate cause of [the plaintiff's] injuries."). "[A] product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning." Jennings v. BIC Corp., 181 F.3d 1250, 1255 (11th Cir. 1999) (internal citation and quotation omitted). In this case, Plaintiff claims that 3M's 8500 mask was defective by virtue of its design and by virtue of its inadequate warning regarding its use around toxic dusts, including asbestos.

(1)     Design Defect

"[T]he definition of design defect is in a state of flux in Florida." In re Standard Jury Instructions in Civil Cases--Report No. 09-10 (Products Liab.), 91 So. 3d 785, 789 (Fla. 2012) (Pariente, J., concurring). Indeed, one Florida appellate court noted that in the "byzantine world of products liability" it is unsettled whether the consumer-expectation test, risk-utility test or both should be applied in evaluating an alleged defect. Force v. Ford Motor Co., 879 So. 2d 103, 106-07 (Fla. 5th DCA 2004) (citation omitted). While the Florida Supreme Court recently reversed an appellate court decision which adopted the risk-utility test to the exclusion of the consumer expectation test, it specifically noted that "parties may . . . present evidence that a reasonable alternative design existed and argue whether the benefit of the product's design outweighed any risks of injury or death caused by the design." Aubin v. Union Carbide Corp., 177 So. 3d 489, 512 (Fla. 2015). Regardless of which test is applied, the Court finds there is insufficient evidence of a design defect to survive summary judgment.

Neither Plaintiff nor Defendants contend that 3M's 8500 mask directly caused Mr. Dugas's injuries. Instead, Plaintiff argues that the mask failed to protect Mr. Dugas from the asbestos that caused Mr. Dugas's injuries. Yet, the 8500 mask was never designed

or intended to protect against asbestos. (Doc. 618.1 at 13 ("The intended use of the 8500 is a nuisance dust, nontoxic dust type of device.")); (Doc. 618.2 at 8 ("It was never intended to be used against hazardous materials such as asbestos.")). Therefore, the 8500 mask cannot be said to have been negligently designed for its failure to protect against a toxic particle, such as asbestos, for which it was not intended to protect against. Anderson v. P.A. Radocy & Sons, Inc., 865 F. Supp. 522, 531 (N.D. Ind. 1994) aff'd, 67 F.3d 619 (7th Cir. 1995) ("[A] product is not defective for failing to do that which it was not designed to do."); see also Triplett v. Minnesota Mining & Mfg. Co., 422 F. Supp. 2d 779, 784 (W.D. Ky. 2006) ("We reject the notion that the 8500 mask was defective because it did not provide protection against exposures which were beyond those for which the product was designed."); High v. Westinghouse Elec. Corp., 610 So. 2d 1259, 1262 (Fla. 1992) ("In order for strict liability to apply to the manufacturer, the [products] in this instance must have been used for the purpose intended."); Aubin, 177 So. 3d at 511 ("The consumer expectations test thus rightly focuses on the expectations that a manufacturer creates.").[9]

On one hand, Plaintiff provides no evidence that the 8500 mask was designed, marketed, or labeled in a fashion that would indicate that the mask was designed to protect against asbestos, and thus, that a consumer would expect the mask to protect against hazardous dust particles.[10] On the other hand, 3M provided various labels and

---

[9] Additionally, a claim of design defect "must be proven by expert testimony." Cooper, 653 F. Supp. 2d at 1225 (internal citations and quotations omitted). For the reasons discussed in the section regarding Mr. Bevis, Plaintiff fails to offer an admissible expert opinion on an alleged design defect.

[10] Mr. Bevis claimed, "3M advertised its 8500 respirators to consumers" without indicating that the mask was for use with non-toxic dusts. (Doc. 408.27 at 9). Mr. Bevis also takes issue with advertisements that depicted the wearer painting and "abrasive

advertisements which accompanied the 8500 masks by the time of Mr. Dugas's alleged use of the 8500 mask, all of which indicated that the mask was to be used with non-toxic particles, and none of which encouraged use of the mask with asbestos. (Doc. 354.11). Accordingly, the mask's failure to protect against asbestos cannot serve as a basis for liability under a theory of design defect. Without a design defect, Plaintiff's claim based on a duty to recall or retrofit based on a claimed design defect must also fail, "assuming . . . that such a duty even exists under Florida law."[11] See Beauregard v. Cont'l Tire N. Am., Inc., 695 F. Supp. 2d 1344, 1357 (M.D. Fla. 2010) (Corrigan J.) aff'd, 435 F. App'x 877 (11th Cir. 2011).

### (2)    Failure to Warn

3M argues that Plaintiff's failure to warn claim, under theories of strict liability and negligence, fails as a matter of law. 3M contends that it had no duty to warn that the 8500 dust mask should not be used to protect against asbestos. In the alternative, 3M argues that the warnings it provided with the 8500 dust mask were sufficient as a matter of law and that 3M's alleged failure to warn was not the cause of Mr. Dugas's injuries.

---

blasting." However, Mr. Bevis's testimony does not alter this Court's conclusion. First, use of the mask for painting or blasting does not speak to its use with toxic substances, much less asbestos. Second, Mr. Bevis could not "really recall" when warnings were placed on the 3M mask, and his recollection was equivocal at best. (Doc. 625.1 at 29 ("If you show me the package, I would stand corrected. Anybody can be wrong[.]"); (When asked about the time period during which warnings were placed on the boxes and packages containing the 8500 dust mask Mr. Bevis could not remember)). Moreover, the undisputed evidence before the Court at this time shows that during Mr. Dugas's tenure in the Navy, the 8500 dust masks were not labeled for use with toxic materials. (Docs. 354.11 and 354.12). To the extent Plaintiff seeks to establish that Mr. Bevis is an expert on this topic, Mr. Bevis fails to establish that his opinion was reached through the application of a reliable methodology, as opposed to the recital of mere anecdotes.

[11] Plaintiff fails to offer any law to support the existence of a duty to recall under existing Florida law.

(a)     Duty to Warn

"The determination of the existence of a duty of care . . . is a question of law,"

Goldberg v. Florida Power & Light Co., 899 So. 2d 1105, 1110 (Fla. 2005), which

generally arises "whenever a human endeavor creates a generalized and foreseeable

risk of harming others." Jennings v. BIC Corp., 181 F.3d 1250, 1257 (11th Cir. 1999)

(quotation and citations omitted). Once formed, the duty requires the creator of the risk

"either to lessen the risk or see that sufficient precautions are taken to protect others

from the harm that the risk poses." Id. (internal quotations and citations omitted). 3M

argues that it had no duty to warn of the dangers of asbestos because its product, the

8500 mask, did not contain asbestos and was itself benign. In support, 3M relies on the

case of Faddish v. Buffalo Pumps, 881 F. Supp. 2d 1361, 1371 (S.D. Fla. 2012), which

held that "a manufacturer's duty to warn, whether premised in negligence or strict

liability theory, generally does not extend to hazards arising exclusively from other

manufacturer's products, regardless of the foreseeability of the combined use and

attendant risk." (emphasis in original). In so holding, the court in Faddish held that the

defendant, whose product was "bare metal[,]" was itself innocuous, and did not

"contribute substantially to causing the harm," could not be liable for failure to warn of

risk of injury posed by use of asbestos. Id. at 1373.

The facts in this case are decidedly different than those in Faddish. The

defendant's product in Faddish could not be reasonably perceived to protect against

asbestos. Moreover, the defendant in Faddish did not derive any benefit from the

Navy's use of asbestos-containing products in conjunction with the defendant's "bare

metal" product. In the instant case, however, 3M has failed to demonstrate that it did not

- 20 -

benefit from the Navy's use of asbestos and other airborne nuisances, which created the need for respiratory protection, which, in turn, created demand for 3M's 8500 dust mask. Indeed, unlike the defendant in Faddish, to whom the use of asbestos or other dangerous products made no difference in its demand, the demand for the 3M 8500 mask's demand was particularly dependent on the use of the dust producing activities described by Mr. Dugas, at least some of which allegedly exposed Mr. Dugas to asbestos. Additionally, 3M's 8500 mask was designed to be a form of respiratory protection. (See Doc. 354.12 (1967 advertisement which markets the 3M 8500 "filter mask" with the slogan, "Protect workers' lungs")). As a product designed to provide protection, it was incumbent upon 3M to warn purchasers of the 8500 dust mask's limits in order to reasonably protect against the "generalized and foreseeable risk of harm[]" the use of the 8500 mask invites. See Jennings v. BIC Corp., 181 F.3d at 1257 (internal quotations and citation omitted).

3M also argues it had no duty to warn Mr. Dugas of the limitations of the 8500 mask because it discharged that duty by warning the Navy. 3M may have been able to discharge its duty to warn by informing the Navy of the limitations of the 3M 8500 mask. See Horrillo v. Cook Inc., No. 10-15327, 2012 WL 6553611, at *3 (11th Cir. Nov. 7, 2012) ("[E]ven if the manufacturer breaches its duty to warn, it may nevertheless mount an affirmative defense and avoid liability by demonstrating [an learned intermediary] was otherwise aware of the particular risk associated with the [product].") (internal citations omitted); Union Carbide Corp. v. Kavanaugh, 879 So. 2d 42, 44 (Fla. 4th DCA 2004) (applying the learned intermediary doctrine in the context of an asbestos supplier and asbestos containing product manufacturer).

When a supplier or manufacturer of a product relies on the learned intermediary defense "the critical inquiry is whether the manufacturer was reasonable in relying on the intermediary to fully warn the end user and whether the manufacturer fully warned the intermediary of the dangers in its product." Aubin, 177 So. 3d at 515. The state of the record before the Court at this time fails to establish that 3M adequately warned the Navy about the 8500 dust mask's limitations and whether 3M was reasonable in relying on the Navy to warn the end-users of the 8500 dust mask of the products limitations.

(b)     Adequacy of Warnings

3M also argues that it provided adequate warnings as a matter of law. Generally the adequacy of a warning if a question of fact. Felix v. Hoffmann-LaRoche, Inc., 540 So. 2d 102, 105 (Fla. 1989). However, when "the warning is accurate, clear, and unambiguous" it can become a question of law. Id. To show that its warnings regarding the 3M 8500 mask were adequate, 3M provides several fliers from the late 1960s and early 1970s which include statements like "excellent filtration for non-toxic dusts, powders, and spray particles . . . for toxic dusts and vapors use Bureau of Mines approved mask"; "FOR PROTECTION AGAINST NON-TOXIC AIRBORNE MATTER"; and "Protect workers' lungs . . . efficient against airborne particles of coal, limestone . . . and other non-toxic dusts." (E.g., Doc. 354.11).

"In analyzing a defective or negligent warning claim, the mere existence of warnings in an instruction manual is not dispositive . . ." Veliz v. Rental Serv. Corp. USA, 313 F. Supp. 2d 1317, 1324 (M.D. Fla. 2003) (internal quotations and citation omitted). Indeed, even a properly worded warning may be defective on account of its location and the manner in which it is displayed. Id. at 1324-25. However, the Court

- 22 -

need only look at the language of the warnings provided in this case to conclude that summary judgment is inappropriate. A reasonable jury could conclude that 3M's warning was insufficient for a number of reasons, including: failure to affirmatively warn that the masks did not protect against asbestos;[12] the warnings only tell the consumers for purposes the mask is "excellent"; and that the warnings fail to convey the significant consequences which can arise from the unintended use of the product. Id. at 1326 (citation and internal quotations omitted).

(c)    Causation

"To demonstrate a products liability claim based on failure to warn, a plaintiff must demonstrate that the failure to warn was the proximate cause of the injury." Cooper, 653 F. Supp. 2d at 1225 (citation omitted). In other words, a plaintiff "must present evidence that the defendant's conduct was, more likely than not, a 'substantial factor' in causing the injury." Whitney v. R.J. Reynolds Tobacco Co., 157 So. 3d 309, 312 (Fla. 1st DCA 2014) (emphasis in original), reh'g denied (Feb. 26, 2015); see also Trek Bicycle Corp. v. Miguelez, 159 So. 3d 977, 980 (Fla. 3d DCA 2015) ("A mere possibility of [] causation is not enough." (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)), review denied 177 So. 3d 1269 (Fla. 2015).

For purposes of this Motion, Mr. Dugas references using the 8500 mask around asbestos in three settings during his tenure in the Navy. Mr. Dugas first used the 8500 dust mask when he was stationed in Iceland. (Doc. 615.1 at 23). Mr. Dugas wore the 8500 dust mask while using "[h]ammers and saws . . . to bust" out cement panels of

---

[12] 3M's warnings assume, perhaps unfairly, that consumers are familiar with which dusts are toxic.

World War II bunkers. Id. at 22. Mr. Dugas did not know what types of materials were used in the barracks other than cement. Id. While tearing out the cement panels, Mr. Dugas would get "filthy dirty" and felt the masks that he wore to be "not at all" effective at preventing dust exposure. Id. at 23.

Mr. Dugas also wore a "little white" mask, one that Plaintiff claims is a 8500 dust mask while working with the 934 adhesive. Mr. Dugas's work with the 934 adhesive involved mixing, applying, and then filing the hardened form of the 934 adhesive. Id. at 32. Filing of the hardened 934 adhesive "made a mess" and created a dusty environment. Id. at 32-33. Despite Mr. Dugas not knowing that the dust had asbestos particles in it, (Doc. 615.5 at 22), Mr. Dugas "didn't feel too safe" while wearing the mask in the vicinity of the dust created by filing the 934 adhesive (Doc. 615.1 at 33). In fact, Mr. Dugas felt that he was breathing the dust despite wearing the mask. Id.

Finally, when cleaning engine bays, Mr. Dugas would "take [] high pressure air and . . . blow it all out." (Doc. 615.5 at 9). Mr. Dugas considered the area to be "dirty" so he wore a "dust mask." (Doc. 615.5 at 11-12). However, Mr. Dugas did not know whether the materials upon which he worked contained asbestos. Id.; see also (Doc. 615.5 at 12-13 (Mr. Dugas describing that he knew that cleaning the engine bay generated dust, but that he did not know whether the dust was asbestos dust.)). He also did not know whether the boxes containing the dust masks came with any warnings or product information because he was not worried about the box, only about the filter. (Doc. 615.5 at 22).

In her Third Amended Complaint, Plaintiff alleges that 3M failed to warn "of the dangers of asbestos while using its masks" which caused Mr. Dugas's exposure to

asbestos dust, which led to his developing mesothelioma. (Doc. 564 ¶ 14). Plaintiff's argument continued that if 3M warned of the consequences of asbestos exposure and the fact that the 8500 mask would not protect against asbestos exposure, then Mr. Dugas would have picked a different trade in the Navy or used a different mask rather than encounter asbestos unprotected.

3M argues that it is not liable to the extent that "Mr. Dugas failed to read and comply with the instructions on the product packaging." (Doc. 354 at 11). "[A] person who did not read a warning label is precluded from challenging the adequacy of the warning or from claiming that the allegedly inadequate warning proximately caused her any damage." Thomas v. Bombardier Recreational Products, Inc., 682 F. Supp. 2d 1297, 1301 (M.D. Fla. 2010); Pinchinat v. Graco Children's Products, Inc., 390 F. Supp. 2d 1141, 1148 (M.D. Fla. 2005) ("Under Florida law, plaintiff's failure to read the warning label extinguishes proximate cause in a failure to warn claim.") (internal citation and quotations omitted).

The Court first notes that, even assuming Mr. Dugas failed to comply with instructions, instructions are not necessarily warnings. Thomas, 682 F. Supp. 2d at 1300 ("An instruction is not a warning.") (citation omitted). The distinction between instructions and warnings is critical when considering that a failure to read a warning defeats a failure to warn claim as a matter of law, Thomas, 682 F. Supp. 2d at 1301, whereas a failure to follow instructions is treated as potential evidence of comparative negligence, Kelman v. Motta, 564 So. 2d 147, 149 (Fla. 4th DCA 1990) (holding that the jury properly considered evidence of comparative negligence where the plaintiff failed to follow the defendant's advice). Secondly, in both Thomas and Pinchinat, the courts

explain that failure to read a warning only bars a failure to warn claim when the failure to read the warning was not the fault of the manufacturer. Thomas, 682 F. Supp. 2d at 1301 ("[W]hen plaintiff cannot read the label due to the fault of the manufacturer her failure to warn theory can be viable.") (citation omitted); Pinchinat, 390 F. Supp. 2d at 1148. In this case, it is possible that a reasonable jury could conclude that Mr. Dugas's failure to read 3M's instructions or warnings was due to their faulty placement or non-existence. See Thomas, 682 F. Supp. 2d at 1301 ("[T]here is a jury issue as to the placement of the Warning, which in turn impacts whether the failure to read the Warning was due to the fault of the manufacturer.").

3M also argues that its failure to include a warning that the 8500 dust mask would not protect against asbestos could not have caused Mr. Dugas to alter his activities in a way to avoid asbestos exposure. To support its argument, 3M references Mr. Dugas's testimony that he had no idea that he was working with asbestos-laden products and that he felt unsafe working around dust, even while wearing the mask. If Mr. Dugas did not know he was working with and around asbestos and already felt unsafe, the argument goes, then a warning to that effect would have made no impact. This argument misses the mark, however, as it fails to consider how an adequate warning addressing the consequences following from a particular misuse would have impacted Mr. Dugas's behavior. See Valencia v. Sanborn Mfg. Co., No. 04-21416-CIV, 2005 WL 5957819, at *18 (S.D. Fla. Aug. 11, 2005) (internal quotations and citation omitted) (denying summary judgment on failure to warn claim where there was evidence "suspectible [to] the inference" that a warning on the severity of injury would have altered the injured's conduct, despite injured's knowledge of the limitations of the

product). It is reasonable for a jury to infer that had Mr. Dugas known that asbestos exposure could lead to his death that he may not have encountered asbestos in the manner in which he did.

Accordingly, it is hereby,

**ORDERED:**

1.    Defendant 3M Company's Motion for Exclusion of Testimony of Darell Bevis (Doc. 350) is **GRANTED in part** and **DENIED in part**.

      (a) Mr. Bevis's shall not offer an opinion on the design of the 3M 8500 dust mask.

      (b) Mr. Bevis may offer an opinion on whether the mask described by Mr. Dugas is an 8500 dust mask.

2.    Defendant 3M Company's Motion for Summary Judgment (Doc. 354) is **GRANTED in part and DENIED in part**.

      (a) Defendant 3M Company's Motion for Summary Judgment (Doc. 354) is **GRANTED** in respect to Plaintiff's claims of design defect and fraudulent concealment.

      (b) Defendant 3M Company's Motion for Summary Judgment (Doc. 354) is **DENIED** in respect to Plaintiff's failure to warn claim.

**DONE** and **ORDERED** in Jacksonville, Florida this 29th day of March, 2016.

BRIAN J. DAVIS
United States District Judge

/p
mw
Copies furnished to:

Counsel of record